# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as<br>roman@occsinc.com, and<br>customerservice@occsinc.com, that are within the<br>possession, custody, or control of Microsoft<br>Corporation | ) ) ) ) ) ) |

Case No. 2:20-MJ-2436

**APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703**

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-2*

There are now concealed or contained the items described below:

*See Attachment B-2*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 7 U.S.C §§ 136l(b)(1) and 136j(a)(1)(A)and(E) | Federal Insecticide, Fungicide, and Rodenticide Act Violations |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

Wendy Su, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  __May 28, 2020_____

_____
*Judge's signature*

City and State:  __Los Angeles, CA_____     Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA: J. Johns (213-503-1690) and M. Williams (ext. 3359)

## **ATTACHMENT A-2**

### **PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the SUBJECT ACCOUNTS identified as roman@occsinc.com and customerservice@occsinc.com that is within the possession, custody, or control of Microsoft Corporation, a company that accepts service of legal process at One Microsoft Way, Redmond, WA 98052, regardless of where such information is stored, held, or maintained.

ATTACHMENT B-2

<u>ITEMS TO BE SEIZED</u>

I.    <u>SEARCH PROCEDURES</u>

1.    The warrant will be presented to personnel of
Microsoft Corporation (the "PROVIDER"), who will be directed to
isolate the information described in Section II below.

2.    To minimize any disruption of service to third
parties, the PROVIDER's employees and/or law enforcement
personnel trained in the operation of computers will create an
exact duplicate of the information described in Section II
below.

3.    The PROVIDER's employees will provide in electronic
form the exact duplicate of the information described in Section
II below to the law enforcement personnel specified below in
Section IV.

4.    With respect to contents of wire and electronic
communications produced by the PROVIDER (hereafter, "content
records," see Section II.10.a. below), law enforcement agents
and/or individuals assisting law enforcement and acting at their
direction (the "search team") will examine such content records
pursuant to search procedures specifically designed to identify
items to be seized under this warrant.  The search shall extract
and seize only the specific items to be seized under this
warrant (see Section III below).  The search team may use
forensic examination and searching tools, such as "EnCase" and
"FTK" (Forensic Tool Kit), which tools may use hashing and other
sophisticated techniques. The review of the electronic data may

1

be conducted by any government personnel assisting in the
investigation, who may include, in addition to law enforcement
officers and agents, attorneys for the government, attorney
support staff, and technical experts.  Pursuant to this warrant,
the investigating agency may deliver a complete copy of the
seized, copied, or disclosed electronic data to the custody and
control of attorneys for the government and their support staff
for their independent review.

5.   If the search team encounters immediately apparent
contraband or other evidence of a crime outside the scope of the
items to be seized, the team shall immediately discontinue its
search pending further order of the Court and shall make and
retain notes detailing how the contraband or other evidence of a
crime was encountered, including how it was immediately apparent
contraband or evidence of a crime.

6.   The search team will complete its search of the
content records as soon as is practicable but not to exceed 120
days from the date of receipt from the PROVIDER of the response
to this warrant.  The government will not search the content
records beyond this 120-day period without first obtaining an
extension of time order from the Court.

7.   Once the search team has completed its review of the
content records and created copies of the items seized pursuant
to the warrant, the original production from the PROVIDER will
be sealed -- and preserved by the search team for authenticity
and chain of custody purposes -- until further order of the
Court.  Thereafter, the search team will not access the data

2

from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.   To the extent that the information described in Attachment A-2 is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNTS listed in Attachment A-2:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, limited to that which occurred on or after January 1, 2020,[1] including:

---

[1] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

3

              i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNTS, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments;

              ii.  All search history and web history, including web clicks or "History Events," by the user of the SUBJECT ACCOUNTS;

              iii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNTS, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

              iv.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNTS, including contacts with support services and records of actions taken.

 b.   All other records and information, including:

              i.   Any and all cookies used by any computer or web browser associated with the SUBJECT ACCOUNTS, including the IP addresses, dates, and times associated with the recognition of any such cookie;

              (I)  any other account associated with the

cookie(s) associated with the SUBJECT ACCOUNTS.

          ii.  Any information identifying the device or devices used to access the SUBJECT ACCOUNTS, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information regarding the types of devices used to access the SUBJECT ACCOUNTS or other device-specific information, including the device type, brand name, device mode or operating system, and first and last times that a device were observed;

          (I)  any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph ii.

          iii.  All subscriber information, including the date on which the account was created,

5

the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNTS.

        iv.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For each SUBJECT ACCOUNTS listed in Attachment A-2, the search team may seize:

a.  All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, and/or instrumentalities of the illegal sale and/or distribution in the United States of an unregistered and misbranded pesticide from January 1, 2020 through the date the search warrant is executed, in violation of 7 U.S.C §§ 136l(b)(1) and 136j(a)(1)(A) and (E), namely:

i.    Information relating to who created, accessed, or used the SUBJECT ACCOUNTS, including records about their identities and whereabouts.

ii.   Documents and records referring or relating to the purchase, manufacture, compounding, and/or processing of MAQUAT 10, QUAT, sanitizer, QUAT Solution, or other unregistered or misbranded pesticide products by or on behalf of OCCS or Ultra Clean.

iii.  Documents and records referring or relating to the purchase of chemicals and/or other ingredients such as alkyl dimethyl benzyl ammonium chloride, alkyl dimethyl ethylbenzyl ammonium chloride, or any other unregistered or misbranded pesticide products.

iv.   Documents and records referring or relating to efficacy claims for MAQUAT 10, QUAT,

7

sanitizer, or QUAT Solution, such as microbiological analysis or other laboratory testing results and reports.

     v.    Documents and records referring or relating to the labeling, packaging, or repacking of MAQUAT 10, QUAT, sanitizer, QUAT Solution, or other unregistered or misbranded pesticide products manufactured by or on behalf of OCCS or Ultra Clean.

     vi.    Documents and records referring or relating to marketing, advertising, sales, or product representations for MAQUAT 10, QUAT, sanitizer, or QUAT Solution, or other unregistered or misbranded pesticide products manufactured by or on behalf of OCCS or Ultra Clean.

     vii.    Documents and records referring or relating to the distribution, sale, transportation, and delivery of MAQUAT 10, QUAT, sanitizer, QUAT Solution, or other unregistered or misbranded pesticide products manufactured by or on behalf of OCCS or Ultra Clean.

     viii.  Documents related to State of California and/or federal rules and regulations applicable to the manufacture, sale, distribution, and shipment of pesticides.

     ix.    Documents and records that show which entity or individuals own, control, or manage OCCS, such as rental or lease agreements, mortgage

8

documents, rental or lease payments, and utility or telephone bills.

b.    All records and information described above in Section II.10.b.

## IV.   **PROVIDER PROCEDURES**

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

   Special Agent Wendy Su
   75 Hawthorne Street, CID-1
   San Francisco, CA 94105
   Phone: (415) 947-4554 / Fax: (415) 947-4559
   Email: su.wendy@epa.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

## AFFIDAVIT

I, Wendy Su, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Environmental Protection Agency ("EPA"), Criminal Investigation Division ("EPA-CID"), and have been since September 2010. I have a Master's degree in Environmental Science and Management from the University of California Santa Barbara, and Bachelor's degree in Sociology and Geography/Environmental Studies from the University of California Los Angeles. I have completed training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, which included the Criminal Investigator Training Program, the EPA-CID Environmental Investigation Basic Training Program, and the Economic Crimes Investigation and Analysis Training Program. In addition, I have received both formal and informal training from FLETC and other institutions regarding computer-related investigations and computer technology. I am charged with investigating environmental crimes including violations of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 et seq., and Title 18 crimes such as wire fraud, false statements, conspiracy, and obstruction of justice. These investigations have often included the execution of search warrants. Pursuant to 18 U.S.C. § 3063, Special Agents of EPA-CID are authorized to apply for and serve search warrants. I have participated in the execution of numerous search warrants involving violations of federal environmental statutes. I have been the lead investigator and/or

1

co-investigator in various criminal investigations for violations of environmental laws.

2.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of, or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

3.      Due to the involvement of potentially dangerous chemicals and the need identify, evaluate, and sample those chemicals, it is the intention of law enforcement personnel to be assisted by non-law enforcement personnel from EPA during the duration of the search warrant.

## II. PURPOSE OF AFFIDAVIT

4.      This affidavit is made in support of two search warrant applications.  The first search warrant application is for the business premises of ORANGE COUNTY CHEMICAL SUPPLY.  The second application is for email accounts associated with the operation of ORANGE COUNTY CHEMICAL SUPPLY.

### A.      Business Premises

5.      This affidavit is made in support of an application for a search warrant for the business premises ORANGE COUNTY CHEMICAL SUPPLY ("OCCS"), doing business as Ultra Clean, a California corporation located at 10680 Fern Avenue, Stanton,

2

California, ("SUBJECT PREMISES"), as further described in
Attachment A-1 to this affidavit. The SUBJECT PREMISES is
believed to contain evidence, contraband, fruits, and/or
instrumentalities of violations of FIFRA (the sale or
distribution in the United States of an unregistered and
misbranded pesticide, namely, the sale of a product purporting
to contain MAQUAT 10, an EPA-registered fungicide and virucide),
7 U.S.C §§ 136l(b)(1) and 136j(a)(1)(A) and (E), as further
described in Attachment B-1 to this affidavit.

    **B.**   <u>**Email Accounts**</u>

    6.    I further make this affidavit in support of an
additional application for a search warrant for information
associated with the accounts identified as roman@occsinc.com,
and customerservice@occsinc.com (the "SUBJECT ACCOUNTS"), that
are stored at premises controlled by Microsoft Corporation (the
"PROVIDER"), a provider of electronic communication and remote
computing services, headquartered at One Microsoft Way, Redmond,
WA 98052.[1]   The information to be searched is described in

---

[1] Because this Court has jurisdiction over the offense(s) being
investigated, it may issue the warrant to compel the PROVIDER pursuant to 18
U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).  <u>See</u> 18 U.S.C. §§ 2703(a) ("A
governmental entity may require the disclosure by a provider . . . pursuant
to a warrant issued using the procedures described in the Federal Rules of
Criminal Procedure . . . by a court of competent jurisdiction") and 2711
("the term 'court of competent jurisdiction' includes -- (A) any district
court of the United States (including a magistrate judge of such a court) or
any United States court of appeals that -- (i) has jurisdiction over the
offense being investigated; (ii) is in or for a district in which the
provider of a wire or electronic communication service is located or in which
the wire or electronic communications, records, or other information are
stored; or (iii) is acting on a request for foreign assistance pursuant to
section 3512 of this title").

Attachment A-2.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B-2.  Upon receipt of the information described in Section II of Attachment B-2, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B-2.  Attachments A-2 and B-2 are incorporated herein by reference.

        7.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, and/or instrumentalities of criminal violations of FIFRA (i.e., the sale or distribution in the United States of an unregistered and misbranded pesticide, namely the sale of a product purporting to contain MAQUAT 10, an EPA-registered fungicide and virucide), 7 U.S.C §§ 136l(b)(1)

---

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information-- but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B-2 paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B-2 paragraph II.10.b.).

and 136j(a)(1)(A)and(E), as further described in Attachment B-2 to this affidavit.

8.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of, or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>THE FIFRA FRAMEWORK</u>

9.     FIFRA regulates, in relevant part, the sale and distribution of all pesticides sold or distributed in the United States. All pesticides sold or distributed in the United States must be registered with EPA. 7 U.S.C. § 136a(a).

10.     Under FIFRA, the term "pesticide" is defined, in relevant part, as ". . . any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest . . ." 7 U.S.C. § 136(u). The term "pest" means ". . . any insect, rodent, nematode, fungus, weed . . . or any other form of terrestrial or aquatic plant or animal life, or virus, bacteria or other micro-organism . . ." 7 U.S.C. § 136(t). The term "active ingredient" means, in relevant part, "an ingredient which will prevent, destroy, repel, or mitigate any pest." 7 U.S.C. § 136(t).

11.  Under FIFRA, the term "producer" is defined as a ". . . person who manufactures, prepares, compounds, propagates or processes any pesticide . . . or active ingredient in producing a pesticide."  7 U.S.C. § 136(w). The term "produce" means "to manufacture, prepare, compound, propagate, or process any pesticide . . . or active ingredient used in producing a pesticide . . . ." 7 U.S.C. § 136(w).

12.  Under FIFRA, the term "label" is defined as the written, printed, or graphic matter on, or attached to, the pesticide or any of its containers or wrappers. 7 U.S.C. § 136(p).

13.  FIFRA provides that a pesticide is misbranded, in relevant part, if its label (i) bears any statement, design or graphic representation which is false or misleading in any particular, (ii) does not conform to EPA standards, or (iii) does not bear the EPA establishment registration number. 7 U.S.C. § 136(q).

14.  Before selling or distributing a pesticide in the United States, the producer (or registrant) must obtain a "registration number" by submitting to EPA for its review information that includes the pesticide formula, the proposed product's use, the proposed label (such as warnings and directions), and data supporting pesticidal claims. 7 U.S.C. § 136a(c). In addition, efficacy tests must be conducted on each proposed product in order to ascertain through testing that the product performs in accordance with its labeling and use directions claims.

6

15.    Each registration number is specific to a particular pesticide formula that has been issued to a particular registrant. The registration number is valid only for the particular pesticide formula produced by the registrant or its EPA-registered licensee. Producers must also obtain an "establishment number" by registering the location where the registered pesticide is produced in order to facilitate inspections. 7 U.S.C. § 136e.

16.    All pesticides sold or distributed in the United States must bear an EPA-approved label that sets forth, in relevant part, the EPA pesticide registration number, the EPA establishment registration number identifying where the pesticide was produced, the net contents, an ingredient statement, and directions and warnings for safe use. 40 C.F.R. § 156.10.

17.    Under FIFRA, it is unlawful for any person to distribute or sell in the United States any pesticide that (i) is not registered with EPA (7 U.S.C. § 136j(a)(1)(A)), or (ii) is misbranded (7 U.S.C. § 136j(a)(1)(E)). It is also unlawful for any producer to fail to register with EPA the establishment location where a pesticide is produced. 7 U.S.C. §§ 136j(a)(2)(L) and 136e(a).

18.    A knowing violation of FIFRA's provisions is a Class A misdemeanor offense with penalties. 7 U.S.C. § 136l(b)(1).

19.    In addition to the Federal FIFRA registration program, many states have a registration system that requires that pesticides also be registered with the particular state.

7

## IV. <u>PREMISES AND PROPERTY TO BE SEARCHED</u>

20.   The SUBJECT PREMISES to be searched is the manufacturing and processing business premises of OCCS located at 10680 Fern Avenue, Stanton, California, as further described in Attachment A-1 to this affidavit, which is incorporated by reference herein.   The SUBJECT ACCOUNTS to be searched are the email accounts roman@occsinc.com and customerservice@occsinc.com, that are stored at premises controlled by the PROVIDER, Microsoft Corporation, a provider of electronic communication and remote computing services, headquartered at One Microsoft Way, Redmond, WA 98052, as further described in Attachment A-2 to this affidavit, which is incorporated by reference herein.

## V.   <u>LIST OF ITEMS TO BE SEIZED</u>

21.   The List of Items to be Seized includes evidence, contraband, fruits, and/or instrumentalities of violations of FIFRA (namely, sale and distribution of an unregistered and misbranded pesticide), as further described in Attachment B-1 to this affidavit, which is incorporated by reference herein.

## VI. <u>OVERVIEW OF INVESTIGATION</u>

22.   This investigation focuses on allegations that OCCS unlawfully produced, sold, and distributed in the United States one or more unregistered pesticide products. In so doing, OCCS unlawfully represented that its unregistered pesticide product was a registered pesticide that was produced by a lawfully registered producer.   As set forth below, the SUBJECT ACCOUNTS have been identified as e-mail accounts used by OCCS to conduct

8

business and correspondence about the unregistered pesticidal
product.

## VII. <u>STATEMENT OF PROBABLE CAUSE</u>

23.  On April 17, 2020, EPA-CID's San Francisco Area Office
received information from the EPA civil enforcement division
regarding a tip and complaint alleging that OCCS sold an
unregistered and misbranded product. The complaint additionally
alleged that OCCS diluted a registered product.

24.  I have reviewed the California Secretary of State
website for business filings and found that OCCS incorporated in
California on January 7, 2002, and was given the entity number
C2495222 on January 10, 2003. In a filing dated August 20, 2018,
OCCS identified its address as 10680 Fern Avenue, Stanton,
California, which is the address of the SUBJECT PREMISES. Roman
Leo Paradiso ("Paradiso") is listed as the Chief Executive
Officer, and Chief Financial Officer. April Leigh Lagueux
("Lagueux") is listed as the Secretary. Both Paradiso and
Lagueux are listed as Directors of OCCS. Lagueux is listed as
the Agent for Service of Process.

25.  I have reviewed records from the Orange County
Assessor's Office, and found that the street address for the
SUBJECT PREMISES is identified as Assessor's Parcel Numbers 126-
591-10 and 126-59-11.

26.  On April 17, 2020, Special Agent ("SA") Christopher
Huntington with EPA Office of Inspector General ("EPA-OIG")

interviewed the original complainant ("COMPLAINANT").[3] The COMPLAINANT stated OCCS is allegedly diluting an EPA-registered pesticide product and selling it as a ready-to-use ("RTU") product called Ultra Clean Sanitizer/Quat Solution. On or about April 17, 2020, I reviewed the OCCS label provided by the COMPLAINANT. The label listed the active ingredients at 0.5%, which is ten times less concentrated than the original registered product, MAQUAT 10. The label provided by the COMPLAINANT listed the EPA Registration ID Number, 10324-63-74439, and EPA Establishment Number 74439-CA-01. The COMPLAINANT stated the concentrate is in high demand due to the pandemic and is in short supply. The COMPLAINANT further stated OCCS sells the Ultra Clean Sanitizer/Quat Solution for approximately $70 a case. Each OCCS case contains 12 quart-sized containers.

27.   On or about April 27, 2020, the COMPLAINANT wrote to SA Huntington and me, "A similar ready to use sanitizer in a 12x1 quart case should sell in the low $20.00 range. We currently sell the concentrate version in a 4x1 gallon case at an avg cost of $33.00 per case.... Just one of these concentrated cases could make 2,048 ready to use sanitizer quart bottles."

28.   On or about May 8, 2020, EPA-OIG SA Huntington browsed various online retailers for the same EPA Registration No. starting with "10324-63" and provided me with the following information:

_____

[3] Complainant is an employee of another chemical company that is a competitor of OCCS.

10

a.    SmartJan (smartjan.com) was selling EnvirOx's SSS Dish San, EPA Registration No. 10324-63-69268, for approximately $82.06 for two one-gallon containers.

b.    McDonald Paper Restaurant Supplies (mcdonaldpaper.com) was selling the one-gallon Diamond Cleaning Disinfectant Concentrate, EPA Registration No. 10324-63-4238, for approximately $44.99.

c.    The Cleaners Depot (thecleanersdepot.com) was selling SANI 100 by ChemTron, EPA Registration No. 10324-63-68921, for approximately $44 for one-gallon, with a limit of one per customer.

29.   I calculated that if one concentrated case at approximately $33.00 a case was purchased by OCCS to make approximately 2,048 quart bottles of Ultra Clean Sanitizer/Quat Solution, and then sold at $70 for 12 one-quart bottles, the seller (OCCS) would collect $11,946.66. This is a gain of approximately $11,913.66. This is approximately a 36,102% increase over the $33.00 investment for a case of concentrated product.[4]

MAQUAT 10 and EPA Registration Number 10324-63

30.   The EPA Office of Pesticide Programs ("OPP") registered MAQUAT 10 in March 1976 under EPA Registration Number 10324-63. On or about January 4, 2016, EPA approved an amended label submitted by Mason Chemical Company for MAQUAT 10.

---

[4] This does not account for costs associated with packaging such as labeling and containers.

31.   The MAQUAT 10 product is registered by EPA for use in
many settings, including: airline terminals, airports,
transportation terminals, public facilities, EMS & fire
facilities, emergency vehicles, ambulances, police cars, fire
trucks, police stations, courthouses, correctional facilities,
municipal government buildings, prisons, jails, penitentiaries,
correctional institutions, banks, churches, office buildings,
federally inspected meat and poultry plants, food processing
plants, food establishments, day care centers, schools, hotels,
motels, restaurants, bars, hospitals, nursing homes, healthcare
facilities, operating rooms, quarantine areas, ICU areas,
patient care rooms and facilities, Emergency Rooms, newborn
nurseries, neonatal units, and restrooms.[5] The approved label for

---

[5] These are areas that are heavily impacted by the COVID-19 pandemic.
For example, the Centers for Disease Control and Prevention (CDC)provides an
"Interim Infection Prevention and Control Recommendations for Patients with
Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare
Settings." In the guidance, it states, "Ensure that environmental cleaning
and disinfection procedures are followed consistently and correctly. /
Routine cleaning and disinfection procedures (e.g., using cleaners and water
to pre-clean surfaces prior to applying an EPA-registered, hospital-grade
disinfectant to frequently touched surfaces or objects for appropriate
contact times as indicated on the product's label) are appropriate for SARS-
CoV-2 in healthcare settings, including those patient-care areas in which
aerosol generating procedures are performed. /Refer to List N on the EPA
website for EPA-registered disinfectants that have qualified under EPA's
emerging viral pathogens program for use against SARS-CoV-2."

Additionally, the CDC's "Reopening Guidance for Cleaning and
Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes"
states, for non-porous surfaces, "Consult EPA's list of approved products for
use against COVID-19. This list will help you determine the most appropriate
disinfectant for the surface or object. You can use diluted household bleach
solutions if appropriate for the surface. Pay special attention to the
personal protective equipment (PPE) that may be needed to safely apply the
disinfectant and the manufacturer's recommendations concerning any additional
hazards. Keep all disinfectants out of the reach of children. ... EPA
approved disinfectants, when applied according to the manufacturer's label,
are effective for use against COVID-19. Follow the instructions on the label

MAQUAT 10 indicates the product was evaluated and found to be effective against several viruses, including Human Coronavirus, on hard, non-porous environmental surfaces.

32.   The active ingredients in MAQUAT 10 are alkyl dimethyl benzyl ammonium chloride and alkyl dimethyl ethylbenzyl ammonium chloride. These active ingredients are known as quaternary ammonium compounds or "quats." Each of these active ingredients makes up approximately 5% of the contents of the product. These active ingredients form the basis for pesticidal claims regulated under FIFRA, specifically the sanitizing, virucidal, and fungicidal claims.

33.   On April 26, 2020, I reviewed the EPA's "List N," which identifies "Products with Emerging Viral Pathogens AND Human Coronavirus claims for use against SARS-CoV-2."[6] EPA Registration Number 10324-63, for the product named MAQUAT 10, is on List N. EPA's website states, "For example, if EPA Reg.

---

for all cleaning and disinfection products for concentration, dilution, application method, contact time and any other special considerations when applying."

[6] The virus that causes COVID-19 is SARS-CoV-2. It is an "emerging viral pathogen," that is, a virus that was heretofore unknown. Because the occurrence of emerging viral pathogens is unpredictable versus established pathogens (e.g., norovirus or rhinovirus, a cause of the common cold), there are few, if any, EPA-registered disinfectant products (pesticides) that will be specifically tested and approved for use against these infectious agents until adequate research has been conducted. In addition, standards for laboratory testing may not have been developed. As a consequence, it may be difficult to assess the efficacy of EPA-registered pesticides against these viruses in a timely manner. In anticipation of the occurrence of emerging viral pathogens and based on experience from pandemic H1N1 and Ebola, on August 19, 2016, the EPA established a guidance to address means by which already established EPA-registered pesticides could be used against emerging viral pathogens, even if the pesticide had not been specifically tested and approved for that use.

No. 12345-12 is on List N, you can buy EPA Reg. No. 12345-12-2567 and know you're getting an equivalent product."

34.   Under FIFRA regulations, 40 C.F.R. § 152.132, a registrant may distribute or sell its registered pesticide under another company's name and address instead of, or in addition to, its own. Such distribution and sale is termed "supplemental distribution" and the product is referred to as a "supplemental registration" or "distributor product." Supplemental distribution is permitted upon notification to EPA if all the conditions set forth in Section 152.132 are met, including that the distributor product is not repackaged, and remains in the producer's unopened container, and that the label of the distributor product is the same as that of the registered product, with limited exceptions described in Section 152.132(d). Both the registrant and supplemental registrant, also referred to as subregistrant, also must comply with applicable state laws.

35.   MAQUAT 10 is sold under a variant of supplemental registration numbers. In order to comply with FIFRA, a subregistrant would be required to sell MAQUAT 10 as it was originally formulated, and under the regulatory conditions set forth in 40 C.F.R. § 152.132.

OCCS Quat Product

36.   On April 24, 2020, Brandon Boatman with EPA's Enforcement and Compliance Assurance Division ("ECAD") told me the following:

14

a.   On or about April 17, 2020, he queried the EPA Section Seven Tracking System ("SSTS") database that contains, among other things, company numbers, establishment numbers, registration data, and annual pesticide product reports.

b.   No companies were listed under EPA Establishment Number, 74439-CA-01, the number on the OCCS label provided by the COMPLAINANT.

c.   The EPA Registration ID Number 10324-63-74439, the other number on the OCCS label provided by the COMPLAINANT, is for a supplemental distributor.

d.   As a supplemental distributor, OCCS can distribute the exact same MAQUAT 10 product but cannot change the formulation. Once the formulation is changed, such as by dilution, that changes the product and it is an unregistered pesticide (refer to Paragraph 17). A supplemental distributor cannot change (e.g., dilute) the MAQUAT 10 product in any way, and has to meet the regulatory conditions set forth in 40 C.F.R. § 152.132.

37.  On or about April 24, 2020, Parissa Naef, Supervisor and Senior Environmental Scientist for the Enforcement Branch of the California Department of Pesticide Regulation ("DPR"), informed me that her records, from 2011 to present, show that DPR had not conducted an inspection of OCCS. DPR records indicate that "Sanitizer/Quat Solution Concentrate - 10%" was registered on May 21, 2012, with the registration number 10324-63-AA-74439.  There are no other 10324-63 registrations listed

for OCCS.[7] Naef later explained that prior to being registered with DPR, products must be registered with EPA.

38.   On or about April 27, 2020, I spoke to Scott McWhorter with EPA's ECAD. McWhorter told me that there are three relevant numbering systems: (1) the company number; (2) the supplemental distributor number; and (3) the establishment number. In order to be a supplemental distributor, OCCS had to register the company with EPA, which results in the company having a company number. OCCS's company number is 74439. The supplemental distributor number uses the registrant number and has the company number added to the end of it. EPA's records show that OCCS neither requested nor received an establishment number.

39.   McWhorter provided me with a record of the EPA Notice of Supplemental Distribution of a Registered Pesticide Product, Form 8570-5. The form lists the product as MAQUAT 10. The notice lists the distributor product name as "Ultra Clean Quality Cleaning Chemicals Sanitizer/Quat Solution Concentrate - 10%." The name of the distributor is listed as "O.C.C.S." The notice is signed and dated by Distributor "Roman Paradiso, President" on January 12, 2012 and by "Mandi Warner, Regulatory Assistant" for the Registrant, Mason Chemical Company, on February 16, 2012. Conditions on the form state the following:

> *1. The distributor product must have the same composition as the basic product.*

---

[7] There is an additional "MAQUAT" product listed with EPA, the MAQUAT 32 PD, registration number 10324-167. On May 21, 2012, OCCS obtained a DPR registration for Sanitizer/Quat Solution Concentrate - 1.56%" under registration number 10324-167-AA-74439.

2. The distributor product must be manufactured
and packaged by the same person who manufactures
and packages the registered basic product.

3. The labeling for the distributor product must
bear the same claims as the basic product,
provided, however, that specific claims may be
deleted if by doing so, no other changes to the
label are necessary.

4. The product must remain in the manufacturer's
unbroken container.

5. The label must bear the EPA registration
number of the basic product, followed by a hyphen
and the distributor's company number.

6. Distributor product labels must bear the name
and address of the distributor qualified by such
terms as "packed for ...", "distributed by ... ",
or "sold by ..." to show that the name is not
that of the manufacturer.

7. All conditions of the basic registration apply
equally to distributor products. It is the
responsibility of the basic registrant to see
that all distributor labeling is kept in
compliance with requirements placed on the basic
product.

On or about April 28, 2020, McWhorter provided me with
additional Form 8570-5's for the MAQUAT 10 product with
Paradiso's signature. The forms are dated May 19, 2012 and April

15, 2013. Based on this information and Paradiso's signatures on the notices, I believe Paradiso, the president of OCCS, is on notice that his product must have the same composition as MAQUAT 10, his product must be manufactured and packaged by Mason Chemical Company, his product must not be repackaged before being sold or distributed, changes to claims made on MAQUAT 10's label are restricted, and that the label must bear the EPA registration number of MAQUAT 10 followed by a hyphen and OCCS's company number.[8]

40.  McWhorter also told me that OCCS has not registered the SUBJECT PREMISES with EPA as an establishment and therefore does not have an establishment number. OCCS needs its own unique establishment number in order to produce pesticides. OCCS cannot lawfully produce any pesticidal products at its Stanton, California facility (the SUBJECT PREMISES). See, 7 U.S.C. § 136e(a).

41.  On or about April 20, 2020, I spoke to Eric Miederhoff, Product Manager in the Antimicrobial Division of EPA OPP. Miederhoff oversees disinfectant registrations for EPA, such as MAQUAT 10. Miederhoff conducted a review of the label provided by the COMPLAINANT. He confirmed that what OCCS had on its label was not allowed by EPA. If the product is diluted, it is considered a formulation activity, and the product must be registered with EPA (refer also to Paragraphs 14 to 16). OCCS is not registered to formulate or dilute the product. Having only

---

[8] Additional EPA 8570-5 forms on file with EPA were signed by Paradiso on May 14, 2012, and April 15, 2013.

received a supplemental registration allowing it to be a distributor of MAQUAT 10, OCCS is only allowed to sell the product as the originally formulated concentrate, as was the case under the MAQUAT 10 labeling approved by EPA.

42.   Miederhoff told me he had the following additional concerns with OCCS' sale of the product:

a.   OCCS is not selling the EPA-approved formulation, i.e., MAQUAT 10. As a supplemental distributor, they are not allowed to modify the formulation before they distribute and sell it.

b.   The MAQUAT 10 registration provides dilution directions (by the end user/purchaser) for different levels of antimicrobial control. For hospitals/medical disinfection, the registration provides dilution instructions for four ounces of product per five gallons of water, which equals 625 ppm. For food contact sanitization, the registration provides dilution directions for two levels -- one or two ounces of product in four gallons of water to achieve either 200 or 400 ppm active in the solution. The concentration of the two active ingredients listed on the OCCS label provided by the COMPLAINANT (0.5% + 0.5%, for a total of 10,000 ppm) exceeds the tolerance exemption set by EPA for use of the product for hospitals/medical disinfection and for food contact sanitization. Food contact sanitization means for use on hard, non-porous surfaces in contact with food.

i.   In my review of the MAQUAT 10 approved label, I noted that under the Precautionary Statements

19

section it states, "HAZARDS TO HUMANS AND DOMESTIC ANIMALS / DANGER. Corrosive. Causes irreversible eye damage and skin burns. Harmful if swallowed, inhaled or absorbed through the skin. Avoid breathing spray mist. Do not get in eyes, on skin or on clothing. Wear goggles or face shield and rubber gloves and protective clothing when handling. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet. Remove contaminated clothing and wash clothing before reuse."

c.   OCCS does not include directions for use for any of the uses on the label aside from disinfection. Sanitization, virucidal, and fungicidal uses should have distinct directions for use. 40 C.F.R. § 156.10.

d.   Miederhoff expressed concern for the safety of having 10,000 ppm of these active ingredients in the product, as compared with the tolerance level established for these chemicals pursuant to 40 C.F.R. § 180.940. That provision sets forth EPA's tolerance exemptions for active and inert ingredients for use in antimicrobial formulations, including the active ingredient chemicals here, DMBAC1 and DMEBAC1. Residues of these two chemicals are exempted from the requirement of a tolerance if the concentration of each chemical used in such antimicrobial formulation is 400 ppm or less.

43.  On or about April 28, 2020, I spoke with Susan Leslie ("Leslie") of Pilot Chemical Company ("Pilot"), who told me the following:

20

a.   Pilot acquired Mason Chemical Company around January 2013.

b.   Approximately a month ago, Leslie received notice that OCCS was taking MAQUAT 10 and promoting it as an RTU product. Leslie stated that this was not allowed. Pilot sent OCCS a cease and desist letter.

c.   About a week or two ago, Leslie received additional information including a photograph of the OCCS RTU bottle.

d.   Pilot immediately moved to cancel all OCCS registrations with EPA.

e.   Leslie stated they were sending a certified letter to OCCS, but had just received notice that the letter was being returned. Leslie stated the address they had on file for OCCS was located in Santa Fe Springs.

44.   On or about May 4, 2020, I reviewed documents provided to me by Pilot and learned the following information:

a.   On or about April 2, 2020, John M. Herrity, senior stewardship auditor for Pilot, sent an email to Roman Paradiso at roman@occsinc.com. The email was titled, "CEASE AND DESIST - Sanitizer/Quat Solution Ready to Use." The email stated the following:

> *My name is John Herrity and I'm the*
> *Stewardship Auditor at Mason Chemical. It*
> *has come to our attention via the attached*
> *label discovered in the marketplace that*
> *OCCS Inc. (EPA Co. No. 74439) is*

21

*distributing an unauthorized and unregistered pesticide labeled as* **Sanitizer/Quat Solution Ready to Use** *with the EPA Reg. No. of 10324-63-74439. Mason Chemical (EPA Co. No. 10324) has never authorized you to produce this product, nor have we ever registered any such brand name on your behalf. Our Maquat 10 basic registration (EPA Reg. No. 10324-63) is not a ready-to-use formulation and is only allowed to be formulated and distributed as a concentrate in strict accordance with all applicable FIFRA regulations. You are currently in violation of numerous compliance issues which violate EPA and FIFRA regulations including, but not limited to, the misbranding and distribution of an unregistered pesticide.*

***Due to these issues, Mason Chemical does not authorize you to produce, package, market, distribute, or offer for sale this product, or any other misbranded or unregistered Mason Chemical affiliated products, or allow any other entities to perform these activities on your behalf. We also require any of this product still in OCCS Inc.'s***

22

> ***control to be disposed of according to***
> ***state, local, and federal regulations.***
>
> *I ask that you confirm receipt of this*
> *email.*

On April 6, 2020, Roman Paradiso replied:

> *What your [sic] looking at is a mocked up*
> *label, we sent to a customer from one of our*
> *salesman to see if it would work for their*
> *use. I have started the process with Tracey*
> *to get a RTU registration started. I do not*
> *want to do anything that would jeopardize*
> *our relationship. I will make sure nothing*
> *is produced until I get a registration from*
> *you guys.*

On April 7, 2020, Herrity replied:

> *Given the numerous compliance issues we ran*
> *across back in 2016 with OCCS in which Ms.*
> *Cher Daun issued a cease and desist,*
> *performed a desk audit, and subsequent*
> *physical audit due to failing the desk*
> *audit, we certainly have a heightened*
> *compliance focus around your company. In*
> *addition to the label we found in the*
> *marketplace, we also received word this*
> *product was being offered for sale for*
> *$72/case. During this pandemic, there is*
> *even a more heightened focus surrounding*

23

*compliance of these registered products then normal as the EPA has released a memo and additional statements confirming that all applicable FIFRA regulations are still required to be followed. In addition, they announced specific and additional enforcement monitoring surrounding the manufacturing, distribution, and importation of these products, especially with regards to human health concerns at the end-use, applicator, and residential levels, even going so far as to say* "EPA is also coordinating with the U.S. Department of Justice and other federal partners to bring the full force of the law against those selling fraudulent or unregistered products". *Current FIFRA fines are just a shade under $20,000* <u>*per occurrence*</u>*, meaning levied fines can easily reach six and seven figures. As the basic registrant, we can be held liable for our supplemental registrant's compliance infractions. I wanted to let you know that if we become aware of any major compliance violations from OCCS in the future, we will move forward with the cancellation of all registered business we have with OCCS as the*

24

*potential liability for reoccurring*
*compliance infractions certainly outweigh*
*any potential benefits. If you have any*
*questions regarding what is allowable under*
*a supplemental registration,* ***please reach***
***out to us and ask for guidance****.*

On April 7, 2020, Paradiso replied, "Understood. Thank you."

<u>The Sale of the Unregistered Product and Alterations to Labeling</u>

45.   On April 22, 2020, EPA-CID SA Daniel Chelko ("Chelko") conducted an undercover operation to purchase the reformulated RTU product from OCCS.  Following the undercover operation, SA Chelko told me the following:

a.   At the SUBJECT PREMISES, he spoke to an individual introduced as "Kenia."

b.   Kenia told him that OCCS usually sells larger quantities of the product to customers such as hospitals.

c.   Kenia told him that the OCCS RTU product kills coronavirus.[9]

d.   Kenia confirmed the product was made on-site in the back of the SUBJECT PREMISES facility.

e.   He purchased three boxes of 32-oz. bottles of "sanitizer" at $72 a box.

f.   During the undercover operation, SA Chelko noted glass doors in the front of the building that led to a waiting

---

[9] Virucidal claims are antimicrobial in nature and are regulated under FIFRA. <u>See</u> 7 U.S.C. §§ 136(mm).

area with a door and reception window on the right. Behind the reception is a wide-open area with a desk and shelf. He also noted a hallway with more offices. To the side of the main building is a warehouse. The warehouse is separated by a wall into two sections. SA Chelko noted an additional office in the warehouse.

g.   OCCS sold the unregistered pesticidal product to the undercover SA Chelko, contrary to what Paradiso previously represented to Pilot (see Paragraph 44).

46.   Based on my review of the EPA-approved MAQUAT 10 label, and the OCCS RTU label purchased by SA Chelko, I noted the following:

a.   The bottles purchased on April 22, 2020 by SA Chelko, were packaged with different labels from what was provided by the COMPLAINANT. The new labeling of the product purchased by SA Chelko changed the name from "Sanitizer/Quat Solution Ready to Use", to "Quat Solution Ready to Use Cleaner."

b.   The labeling also removed the supplemental EPA registration number from the front, but still references the EPA registration number for MAQUAT 10 as part of the product explanation.

c.   The active ingredients alkyl dimethyl benzyl ammonium chloride and alkyl dimethyl ethylbenzyl ammonium chloride are listed on the label at 0.04% each.

47.   As a result, I have concluded that OCCS's sale of these bottles to SA Chelko constitutes a sale of an unregistered

and misbranded pesticide in violation of 7 U.S.C.
§ 136j(a)(1)(A) and (E).

48. The EPA-approved MAQUAT 10 label has specific
instructions for use of the product in various settings, whereas
the OCCS RTU product purchased by SA Chelko does not provide
dilution instructions or contact times, meaning how long the
product needs to stay on a surface to be effective. The label
does not differentiate between settings and further states, "For
use as a cleaner in food plants, food establishments, food
areas, equipment, homes, hospitals, nursing homes, health care
institutions, schools, food services, and farms." The MAQUAT 10
label specifically has instructions of a 10-minute contact time
for hospital or medical environment claims, and for public
health virucidal claims. The contact times for usage varies from
one minute to ten minutes. Again, the OCCS RTU does not
differentiate or give contact times.

49. Additionally, if a purported total 1% active
ingredient concentration on the label provided by the
COMPLAINANT is the equivalent of 10,000 ppm (refer to Paragraph
42.b), the purported 0.08% total active ingredient concentration
(0.04% + 0.04%) on the label obtained by SA Chelko is the
equivalent of 800 ppm.[10] 800 ppm still exceeds the active
ingredient level approved by EPA for the MAQUAT 10 product
related to hospital or medical environment claims, public health

---

[10] 1.0% = 10,000 ppm ; 10,000 ppm/X ppm = 1%/0.08% ; 10,000 ppm/X ppm =
12.5 ; X ppm = 10,000 / 12.5 ; X = 800 ppm

virucidal claims, fungicidal claims, and mold and mildew claims.[11]   Thus, the efficacy and safety of this higher level, which differs from the level EPA approved through the MAQUAT 10 registration process, has not been evaluated nor approved by the EPA.

50.   On or about May 8, 2020, I spoke to Dr. Kristen Keteles, a toxicologist with EPA's National Enforcement Investigations Center ("NEIC"), who told me the following:

a.   A product that may appear at first to be exactly like a registered product often will fail the efficacy test (refer to Paragraph 14) because, for example, an inert ingredient can block the efficacy of an active ingredient. The only way to know the efficacy of a product is for that product to go through the EPA OPP FIFRA registration process which includes the performance of testing.

b.   Companies going "rogue," even if they are basing their products on existing products, pose a problem because the efficacy of the product is unknown, and potentially may result in unintended health impacts.

c.   FIFRA's registration process exists to protect consumers and the public and, if the registration process is not followed, EPA cannot ensure public safety.

51.   On or about May 5, 2020, I received a report from EPA NEIC Chemist Daniel Hurlbut, who provided me with the following information:

---

[11] The MAQUAT 10 active ingredient level and use directions for these claims is 4 ounces for every 5 gallons of water, and 10 minutes of contact time. 4 ounces for 5 gallons is approximately 625 ppm.

a.    Hurlbut did an analysis of the containers that were purchased by SA Chelko on or about April 22, 2020.

b.    Hurlbut's report states, "According to the container labels, the active ingredients in this cleaning product included 0.04 percent (%) alkyl (C12, C14, C16, C18) dimethy benzyl ammonium chloride (""DMBACl) compounds and 0.04% alkyl (C12, C14) dimethyl ethylbenzyl ammonium chloride ("DMEBACl") compounds."

c.    The report also provides, "The removal of the product label from Container #1 revealed another label attached to the container. The product name on this inner label was "Sanitizer/Quat Solution Ready to Use," and an EPA registration number (10324-63-74439) was present. The active ingredient content listed on this label was 0.5% DMBACl compounds and 0.5% DMEBACl compounds." (Affiant note: This second label lists the same active ingredient content as the label that was previously provided by the COMPLAINANT).

d.    Hurlbut's analysis of the active ingredients showed a range of 0.054% to 0.028% for total DMBACl content, and a range of 0.056% to 0.031% for total DMEBACl content, despite the label listing each of the two active ingredients at 0.04% in the bottle.[12]

---

[12] Certified limits are required for each active ingredient, per 40 C.F.R. § 158.350, and testing of the OCCS product purchased by SA Chelko shows that the concentration of the product's active ingredients vary greatly. Unless otherwise approved by EPA pursuant to the FIFRA registration process, for an ingredient present in a formula at less than or equal to 1.0%, the allowed deviation is plus or minus 10% of the "nominal concentration" (i.e., the amount of the ingredient expected to be present,

52.   On or about April 23, 2020, Miederhoff also conducted a review of the labeling obtained by SA Chelko on April 22, 2020, and provided me with the following information:

a.   Miederhoff stated the labeling was problematic. Namely, the labeling refers to pesticides, and the disposal of pesticides, but lacks a proper EPA registration number for the product itself.

b.   There is the reference to MAQUAT 10, meaning it is a pesticidal product, even though the labeling does not declare this explicitly. The name of the product is "Quat Solution" implying it is a form of MAQUAT 10.

c.   Miederhoff stated OCCS is an unregistered establishment manufacturing an unregistered pesticidal product.

53.   I concluded that this constitutes a violation of 7 U.S.C. § 136e and 7 U.S.C. § 136j(a)(1)(A).

<u>Distribution of the Unregistered Product by OCCS</u>

54.   During the undercover purchase of the product on April 22, 2020, OCCS employee "Kenia" told SA Chelko that OCCS can ship products. She told SA Chelko that if a person from outside of California wished to purchase this product, they would have to contact OCCS via their customer service email, customerservice@occsinc.com and inquire about placing the order.

---

per 40 C.F.R. § 158.300). Therefore, even assuming that the OCCS product had been legitimately registered with and approved by EPA, which it is not, the product must be within that specific range unless otherwise approved. Thus, for a product whose label states 0.04% for each active ingredient, such as the OCCS product purchased by SA Chelko, the standard certified limits as set forth in the regulation would be 0.036% to 0.044% for each active ingredient. As demonstrated through NEIC's sampling, the concentration of active ingredients in the OCCS product have been found to be outside of the standard certified limits.

55.   Based on my training and experience, and as demonstrated through correspondence with the UC email account in the following paragraphs, the above paragraphs referencing Paradiso's communication with Pilot, and Kenia's statement to the undercover agent regarding email, emails are a commonly used tool to communicate in an office environment. To facilitate communication via email, there are generally computers and/or laptops in a facility's office spaces, including office space in a warehouse.

56.   On April 23, 2020, I created an undercover email account and sent an email to customerservice@occsinc.com asking for additional information on the Quat product and inquired about shipping to New Mexico. The reply was sent by "Kenia Barragan," and provided the company phone number and a cellular phone number.

57.   On April 24, 2020, at my direction, EPA-CID SA James Mercier acting in an undercover capacity located in Denver, Colorado, called the OCCS phone number, (714) 816-3040, and spoke with "Kenia" via telephone. The SA Mercier told me the following regarding his call with Kenia:

a.   SA Mercier stated he had traded emails the prior day with her.

b.   When asked, Kenia stated she, "was not familiar with the MAQUAT 10 product."

c.   She said the product, which SA Chelko purchased on April 22, 2020, is a disinfectant and it can be placed on any type of hard surface. Kenia stated the product "actually has the

31

coronavirus listed on there as one of the primary things as well." Kenia stated the company can ship to New Mexico. She told SA Mercier the product is RTU.

d.   Kenia further told SA Mercier that OCCS was producing approximately 1,200 bottles a day.

e.   Kenia stated most of their clientele is corporate janitorial and that, "The product is being distributed to numerous places whether it, you know, it's hospitals and stuff, or even restaurants."

f.   At the conclusion of the phone call SA Mercier asked for additional information to be sent via email. The undercover email received a "Technical Bulletin" from Barragan at customerservice@occsinc.com. The bulletin had OCCS listed at the bottom. The information at the top of the brochure stated, "SANITIZER/QUAT RTU," and "READY TO USE SANITIZER - FOOD GRADE - EPA REGISTERED." (Agent note: This is a false statement because the OCCS RTU Quat product is not EPA registered).

58.   I have determined that if OCCS is producing approximately 1,200 bottles a day, as stated by Kenia, and there are 12 one-quart containers per case, OCCS is producing enough product to fill 100 cases a day. At approximately $70 per case (see Paragraph 26) to $72 per case (see Paragraph 45.e), that is approximately $7,000 to $7,200 a day. If the facility is operating at a conservative five days a week, and there are 22 weekdays days in April 2020, that amounts to $154,000 to $158,400 in April 2020 alone for the sale of a misbranded and unregistered product.

32

59.  On or about May 13, 2020, I reviewed the website of the SUBJECT PREMISES, www.occsinc.com/warehousing/. On the website, it stated, "We have over 100,000 ft of warehouse space along with our very own truck fleet."

60.  On or about Sunday, April 19, 2020, I saw a Honda, California license plate 8BTF386 parked in the parking lot in front of the SUBJECT PREMISES. The registered owner of the vehicle is listed as, "OCCS INC, OR PARADISO ROMAN L" with the same address as the SUBJECT PREMISES.

61.  On or about Monday, April 27, 2020, Homeland Security Investigations SA Michael Lesley ("Lesley") followed the same Honda, from the SUBJECT PREMISES to Prime Paper, 12000 Woodruff Avenue, Downey, California 90241. Agent Lesley has advised me that upon arrival, the Honda Civic backed up to the loading dock that had a "SHIPPING & RECEIVING OFFICE" sign pointing to it and four individuals in matching black shirts, with "OCCS" in large lettering on the back, got out of the Honda. The rear hatch door to the Honda was open.

62.  On or about May 22, 2020, EPA-OIG SA Huntington submitted the PROVIDER a preservation letter requesting that the information associated with the SUBJECT ACCOUNTS be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

63.  Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNTS by other means.

## VIII.        TRAINING AND EXPERIENCE ON DIGITAL DEVICES[13]

64.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

65.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus,

often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

66.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX.  BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

67.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical

address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

68. Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNTS.

69. A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

70.  In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNTS.

71.  In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under

investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNTS.

72.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNTS, I am requesting a

warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNTS with the date restriction included in Attachment B-2 for review by the search team.

73.   Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNTS.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

74.   I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures

set forth in Attachment B-2, is necessary to find all relevant evidence within the account.

75.   I have also learned that providers of e-mail and social media services often track the behavior and activities of persons using accounts by using cookies, which are strings of characters and numbers stored on a person's computer on their web browser.  These cookies can often show whether more than one account was accessed by the same computer (and specifically the same web browser), as the provider can recognize that cookie when the same device returns to the service to access an account.

76.   Providers also frequently obtain information about the types of devices that are used to access accounts like the SUBJECT ACCOUNTS.  Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices. Individual computers or devices are identified by a number of different means, some of which are assigned to a particular device by a manufacturer and connected to the "hardware" or the physical device, some are assigned by a cellular telephone carrier to a particular account using cellular data or voice services, and some are actually assigned by the provider to keep track of the devices using its services.  Those device identifiers include Android IDs, Advertising IDs, unique application numbers, hardware models, operating system versions, unique device identifiers, Global Unique Identifiers or "GUIDs," serial numbers, mobile network information, phone numbers, device serial numbers, Media Access Control ("MAC") addresses,

41

Electronic Serial Numbers ("ESN"), Mobile Electronic Identity
Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile
Identification Numbers ("MIN"), Subscriber Identity Modules
("SIM"), Mobile Subscriber Integrated Services Digital Network
Numbers ("MSISDN"), International Mobile Subscriber Identifiers
("IMSI"), or International Mobile Equipment Identities ("IMEI").
Apple, one of the primary suppliers of mobile devices used to
access accounts like the SUBJECT ACCOUNTS, had previously used
an identifier that was unique to the hardware of its devices,
such that details of a device's activity obtained from a
particular application or "app" could be used to target
advertisements for the user of that device.  Apple replaced that
hardware-based identifier with the Apple advertiser ID or IDFA
that is still unique to a particular device, but which can be
wiped and re-generated anew by a user if a user chooses to do
so.  Most users, however, do not know that the IDFA exists, and
therefore are unaware that their device's activity can be
correlated across different apps or services.  Google uses a
similar advertiser ID referred to as an AAID.

77.  These device identifiers can then be used (a) to
identify accounts accessed at other providers by that same
device, and (b) to determine whether any physical devices found
in the course of the investigation were the ones used to access
a SUBJECT ACCOUNTS.  The requested warrant therefore asks for
the device identifiers, as well as the identity of any other
account accessed by a device with the same identifier.

78.   In my training and experience, providers also keep a
record of search queries run by the user of the account, whether
searches within the services of the provider for persons,
content, or other accounts (such as if a user is trying to find
the account of an acquaintance), or broader Internet searches.
In some instances, providers may also keep records of which
websites or contents were "clicked on" as a result of these
searches.  This information is helpful in the context of the
case to show the topics about which the user was trying to
obtain more information or conduct research, and is relevant for
"user attribution" evidence, analogous to the search for
"indicia of occupancy" while executing a search warrant at a
residence.

79.   In order to identify other accounts used or maintained
by the user of a SUBJECT ACCOUNTS, the warrant also calls for
the PROVIDER to disclose both (1) any cookies associated with
the SUBJECT ACCOUNTS, i.e., those cookies that were placed on
any computers or web browsers (for example, Internet Explorer or
Google Chrome) used to access the SUBJECT ACCOUNTS, and (2) the
identity of any other account in which the same cookie or
cookies used to access the SUBJECT ACCOUNTS was/were recognized.
If in the course of the investigation the digital devices used
by the subject(s) of the investigation are found, they can be
searched to determine if the cookies recognized by the provider
are stored on those devices.  The warrant also calls for the
PROVIDER to identify any other accounts accessed by any computer
or web browser using the same cookies as the SUBJECT ACCOUNTS by

43

providing subscriber records and log-in information for those other accounts (but not to provide the contents of communications in those other accounts).

80. This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

81. As set forth in Attachment B-2, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a. I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNTS as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNTS.

44

82.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## X.   CONCLUSION

83.   Based on the foregoing, there is probable cause to believe that evidence, contraband, fruits, and/or instrumentalities of violations of FIFRA, 7 U.S.C §§ 136l(b)(1) and 136j(a)(1)(A) and (E), for the time period of January 1, 2020 to present (as the COVID-19 pandemic situation developed in the United States), as described above and in Attachment B-1 of this Affidavit, are located at the SUBJECT PREMISES, as further described above and in Attachment A-1 of this affidavit.

84.   Based on the foregoing, there is probable cause to believe that evidence, contraband, fruits, and/or instrumentalities of violations of FIFRA, 7 U.S.C §§ 136l(b)(1) and 136j(a)(1)(A) and (E), for the time period of January 1, 2020 to present (as the COVID-19 pandemic situation developed in the United States), as described above and in Attachment B-1 of

45

this Affidavit, are located at the SUBJECT ACCOUNTS, as further described above and in Attachment A-2 of this Affidavit.

85. Based on the foregoing, I request that the Court issue the requested warrant. The government will execute this warrant by serving the warrant on the PROVIDER. Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_____
Wendy Su, Special Agent
U.S. Environmental Protection
Agency

Subscribed to and sworn before me
this 28 day of May, 2020.


_____
HONORABLE JUDGE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

46